UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Antonio Gonzalez,

    *Plaintiff,*

v.

Elmwood Park Community Unit School
District No. 401,

    *Defendant.*

No. 24 CV 2014

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Elmwood Park Community School District No. 401 (the "District") fired Antonio Gonzalez, the head of security at Elmwood Park High School ("EPHS"), after Gonzalez purportedly conducted an unauthorized and inappropriate investigation into an incident involving a student bringing a gun to campus (the "Incident"). Gonzalez has now sued the District, alleging his termination was in retaliation for him exposing the truth about the District's inadequate response to the Incident. Before the Court is the District's motion to dismiss the complaint in its entirety. For the reasons stated, the motion is denied in part and granted in part.

## I.  Background

The Court takes Plaintiffs' well-pleaded factual allegations as true for purposes of ruling on the motion to dismiss. *See Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In September 2022, Gonzalez executed a contract with EPHS to serve as its Security Supervisor for the 2022–2023 school year. [Dkt. 1 ¶ 102; Dkt. 1-

1 at 2.][1] During this time, Gonzalez also worked as an Auxiliary Officer for the River Grove Police Department ("RGPD"). Gonzalez's role as Security Supervisor was to ensure everyone's safety and security through monitoring the school as well as its students. [Dkt. 1 ¶¶ 11-14.]

Gonzalez voiced concerns with the District's response to various security threats within his first few months on the job. For example, in October 2022, a hall monitor allowed an out-of-state adult who had no children at EPHS to enter the building during school hours. Upon learning of the adult's presence, Gonzalez urged EPHS Deans Agnes Stankiewicz and Jim Lestos to lockdown the school, but they refused. Gonzalez relayed this episode to the RGPD, which led the police to offer to run joint safety courses with EPHS; the District declined. According to Gonzalez, the District also rejected his suggestions to adopt policies preventing students from letting food delivery drivers into the school, and to train hall monitors on emergency response situations. [*Id.* ¶¶ 17-25.]

Amidst this backdrop, the Incident occurred on March 6, 2023. Gonzalez alleges his involvement began when EPHS Deans Lestos and Tom Lentine approached him regarding a student who purportedly possessed a vape on campus in violation of school policy. Gonzalez sought out and found the student based on this information. The student immediately fled campus once Gonzalez confronted him, leading Gonzalez to call RGPD to report the truancy. After contacting RGPD, Gonzalez contends Dean Lentine told him that the student had a firearm, not a vape,

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

an assertion later confirmed when the police found a loaded gun in the student's bag. Once RGPD apprehended the student, Gonzalez complained to Lestos, Stankiewicz, and EPHS's Principal that the school's failure to warn him about the firearm prevented him from putting the school on lockdown and taking other appropriate measures to protect the school. [*Id.* ¶¶ 26-32, 34-38.]

Representatives from the RGPD and Elmwood Park Police Department ("EPPD") met to discuss the Incident two days later. Gonzalez alleges that Vic Pieramatti, a member of EPPD and the Student Resource Officer for EPHS, called him during the meeting to ask him to gather information regarding the Incident, including a timeline of events. Gonzalez alleges Pieramatti also directed him "to find out when and what was said by the student who reported the firearm." In response, Gonzalez reviewed surveillance video and interviewed the student who initially reported the firearm. According to Gonzalez, the student voluntarily showed him relevant text messages on her phone during the interview. [*Id.* ¶¶ 41-42.]

On March 9, 2023, the District placed Gonzalez on administrative leave. Later that day, the student Gonzalez interviewed attempted to press criminal charges against Gonzalez.[2] [*Id.* ¶¶ 45-46.]

The following day, students, parents, and EPHS staff organized a walkout over the District's response to the Incident, which garnered significant attendance and media attention. [*Id.* ¶¶ 48-50.] In connection with the walkout, and while on administrative leave, Gonzalez participated in an interview with Fox News. Gonzalez

---

[2]     Gonzalez believes the student (who the District interviewed after Gonzalez) filed charges at the behest of the District in an attempt to silence him. [*Id.* ¶¶ 43, 47.]

relayed his version of events, which "corrected misinformation that was previously conveyed to EPHS parents by" the District. The interview was later shown on television, leading the District's Superintendent, Dr. Leah Gauthier, to admonish Gonzalez that he was not allowed to speak to the media. [*Id.* ¶¶ 51-54.]

The District terminated Gonzalez on April 3, 2023, after nearly a month of administrative leave. The District's stated reasons for firing Gonzalez were that he "conducted an unauthorized investigation", interfered with a police investigation, and engaged in "inappropriate conduct." Gonzalez emailed Dr. Gauthier asking for an opportunity to appeal his termination to the school board, but she rejected the request outright. According to Gonzalez, his termination was pretextual, and he was fired for publicly expressing his concerns with Defendant's response to the Incident. [*Id.* ¶¶ 55-59.]

Roughly three months after he was fired as Security Supervisor at EPHS, the District informed RGPD's Chief of Police that it had a "no-trespass" order against Gonzalez, and that he was no longer permitted to work on District property or at District events in his role as an Auxiliary Officer for RGPD. [*Id.* ¶ 60.]

In response, Gonzalez filed this lawsuit raising seven claims: (I) retaliatory discharge; (II) violation of the Illinois Whistleblower Act ("IWA"), 740 ILCS 174, *et seq.*; (III) First Amendment violation; (IV) tortious interference with prospective business relationships; (V) violation of the Illinois Wage Payment and Collections Act ("IWPCA"); (VI) deprivation of due process to property rights; and (VII) deprivation of occupational liberty. [Dkt. 1 at 10-19.] The District now moves to dismiss all claims.

4

## II.    Legal Standard

At the motion to dismiss stage, the Court takes well-pleaded factual allegations as true and draws reasonable inferences in favor of the plaintiff. *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023); *Reardon v. Danley*, 74 F.4th 825, 826-27 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up). This occurs when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 999 (N.D. Ill. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted)).

## III.    Analysis

The District's motion raises two distinct arguments as to why Gonzalez's claims should be dismissed. First, it argues Counts I, II, and IV are barred by Illinois's Tort Immunity Act ("TIA"), 745 ILCS 10/1, *et seq*. Second, it argues Gonzalez has failed to state a claim for any of his causes of action. The Court reviews each in turn.

### A.    Tort Immunity Act

The District contends Gonzalez's common law retaliatory discharge, IWA, and tortious interference claims are barred by the combination of two provisions of the TIA, Sections 2-109 and 2-201. Immunity under the TIA is an affirmative defense that "requires a fact-intensive inquiry that must be made on a case-by-case basis." *Harris v. City of Chicago*, 479 F.Supp.3d 743, 753 (N.D. Ill. 2020). The TIA is "strictly

5

construed against the public entities involved." *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 884 (N.D. Ill. 2015).

Section 2-201 states "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion." 745 ILCS 10/2-201. Under Section 2-109, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Taken together, the District contends none of its employees can be liable for the discretionary decisions to fire Gonzalez, or to procure a no-trespass order against him and bar him from working events on District property. And because no District employees can be liable, the argument goes, the District itself cannot be liable. [Dkt. 11 at 3-5.]

There are a few problems with this argument. First, the District's immunity argument is an affirmative defense, which a complaint need not "anticipate and overcome." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). Dismissal at the pleading stage is appropriate only when "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014). The Complaint does not do so.

Nor does TIA immunity lend itself to resolution at the dismissal stage. "There are two requirements for immunity to attach under section 2-201. First, a defendant must prove that the employee held either a position involving the determination of

policy or the exercise of discretion. Second, the act or omission giving rise to the injury must result from both a determination of policy and an exercise of discretion." *Strauss v. City of Chicago*, 2022 IL 127149 ¶ 60; *see also Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 679 (7th Cir. 2009) ("Section 2–201 immunizes an individual defendant only to the extent that the action he is being sued for involves both the making of a policy choice and the exercise of discretion") (citing *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 285 (2003)). A discretionary decision is one that is "unique to a particular public office." *Valentino*, 575 F.3d 664, at 679. Policy choices under Section 2-201 are those "requiring a governmental entity to balance competing interests and to make a judgment call as to what solution will best serve those interests." *Id.*

Personnel decisions aimed at a single employee are typically not considered policy choices because there are rarely "competing interests" at play. *Id.* ("Owen's one-time decision to fire one employee, Valentino, does not amount to a 'judgment call between competing interests.' In fact, we are at a loss to identify any competing interests at all"); *see also Bello v. Vill. of Skokie*, 151 F.Supp.3d 849, 866 (N.D. Ill. 2015) ("if defendants were retaliating against Bello when they ordered him to cease responding 'kill' in roll call, ordered him to attend counseling, and suspended him, they were not balancing competing interests, and they are not entitled to immunity under the TIA"); *Weiler*, 86 F. Supp. 3d 874, at 885 (allegations that employee was terminated because of retaliatory motives sufficient to survive motion to dismiss); *Harris*, 479 F. Supp. 3d 743, at 753 (denying motion to dismiss on TIA immunity

grounds where it was unclear "whether it was a discretionary policy decision to temporarily strip Harris of his police powers"); *Carroll v. City of Oak Forest*, 2020 WL 2526483, at *6 (N.D. Ill. May 18, 2020) (collecting cases).[3]

According to the Complaint, the District made two relevant decisions as to Gonzalez; the decision to terminate him (relevant to the retaliation and IWA claims) and the decision to obtain a no-trespass order and bar Gonzalez from working at District events (relevant to the tortious interference claim). The Court cannot decide at this stage how either decision was the result of "balance[ing] competing interests." Rather, taking Gonzalez's allegations as true, he was terminated because he publicized the District's inadequate response to the Incident. *See Weiler*, 86 F. Supp. 3d 874, at 885. Indeed, it is not even clear *who* made the decision to terminate Gonzalez (or to bar him from working events on District property), so the Court could not possibly ascertain from the pleadings alone whether "the employee held either a position involving the determination of policy or the exercise of discretion." *Strauss*, 2022 IL 127149 at ¶ 60. Dismissal based on Section 2-109 immunity is denied.

Briefly, the Court notes the District's immunity argument faces a potentially larger problem: Section 2-109 immunity is only available to a municipality when the

---

[3]     The District cites to *Graham*, a case which states "[m]unicipal decisions regarding the hiring, firing, discipline, and supervision of employees are discretionary policy decisions." 2019 WL 215098, at *6. Considering cases such as *Valentino*, the Court respectfully views the cited quote as an oversimplification of the law, particularly in circumstances (as here) where the decision impacted only a single employee and was not in response to an articulated policy directive. *Cf. Breuder v. Bd. Of Trustees of Cmty. Coll. Dist. No. 502, DuPage Cty., Illinois*, 238 F.Supp.3d 1054, 1065-66 (N.D. Ill. 2017) (finding claim barred by TIA where defendants "were acting pursuant to a policy platform with the stated aim to eliminate waste, fraud, and abuse.")

harm was caused by the actions of an employee, not the employer itself. *Smith v. Waukegan Park Dist.*, 896 N.E. 2d 232, 235-36 (Ill. 2008) ("Section 2-109 only grants immunity to a public entity from 'an injury *resulting from an act or omission of its employee* where the employee is liable") (emphasis in original); *see also Valentino v. Vill. of S. Chicago*, 575 F.3d 664, 679 n.4 (7th Cir. 2009) (noting that in *Smith*, the "Illinois Supreme Court … called into doubt a municipality's ability to combine sections 2–201 and 2–109 to extend immunity from a municipal official to the municipality itself. It reasoned that where the municipality is the pertinent actor that performed the alleged retaliatory action, section 2–109 is not implicated.")

Case law strongly suggests that claims for retaliation and violations of the IWA—both of which are based on an employer's decision to act against (i.e., terminate) an employee—are not caused by a (supervisory) employee. *Smith*, 896 N.E. 2d 232, at 236 ("we hold section 2–109 immunity does not apply in cases of retaliatory discharge because the employer, not the employee, ultimately causes the injury"); *Spratt v. Bellwood Public Library*, 380 F.Supp.3d 783, 789 (N.D. Ill. 2019) ("TIA immunizes government entities from liability for torts committed by employees, but retaliatory discharge claims are the result of wrongdoing by an employer"); *Zelman v. Hinsdale Twp. High Sch. Dist. 86*, 2010 WL 4684039, at *2 (N.D. Ill. Nov. 12. 2010) ("[a]lthough the plaintiff in Smith was claiming retaliatory discharge for filing a workers' compensation claim and not claiming protection under the IWA, the principle is the same"); *see also Harris*, 479 F.Supp.3d 743, at 753, n. 8 (recognizing IWA claims can be based on employer wrongdoing). Based on this precedent, the

Court doubts the District can avail itself of Section 2-109, but need not decide the issue today.[4]

Gonzalez concedes, [Dkt. 19 at 6], however, that the TIA immunizes the District from any claims for punitive damages, so that portion of the District's motion is granted.

### B. Sufficiency of Allegations

The Court now turns to the District's argument that Gonzalez has failed to adequately plead each of his claims.

### 1. Retaliatory Discharge

To state a claim for retaliatory discharge under Illinois law, a plaintiff must show "(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019) (quoting *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009)). Determining whether a "clearly mandated public policy" exists is a question of law, and while there is "no precise definition", "generalized expressions of public policy" are insufficient. *Turner*, 911 N.E.2d 369, at 374-75. Accordingly, this tort is "limited and narrow" and is only permitted in one of two circumstances: "where an employee is discharged for filing, or in anticipation of filing, a claim under the Workers' Compensation Act; or when an

---

[4]     The same logic applies to Gonzalez's tortious interference claim. Here too, Gonzalez alleges the District (and not any one employee) caused his injury when it obtained a no-trespass order against Gonzalez and barred him from working District events. But the Court is dismissing Gonzalez's tortious interference claim on the merits, *see infra* at 15-17, so it need not decide the issue.

employee is discharged in retaliation for the reporting of illegal or improper conduct." *Mims v. Boeing Company*, 2022 WL 2316199, at *4 (N.D. Ill. June 28, 2022) (quoting *Michael v. Precision Alliance Group, LLC*, 2014 IL 117376 ¶ 30). Illegal or improper conduct includes "whistleblowing" because otherwise "an employer could effectively frustrate a significant public policy by using its power of dismissal in a coercive manner." *Michael*, 2014 IL 117376 ¶ 30.

Gonzalez contends the District terminated him for investigating and vocalizing his safety concerns regarding the District's response to the Incident. [Dkt. 1 at 10-11.] To support his argument that keeping schools safe from gun violence is a clearly mandated public policy, Gonzalez points to Illinois statutes which (1) set school standards for safety drills related to shooting incidents; (2) prohibit firearms on school grounds; and (3) delineate reporting requirements for school staff and principals when there are reports of firearms on campus. [*Id.*]

The District's motion makes two arguments. First, retaliatory discharge is only applicable to at-will employees, but Gonzalez alleges he was under an employment contract. Second, Gonzalez has failed to identify a sanctioned public policy the District violated. [Dkt. 11 at 6-7.]

The District's first argument relies on *Rehfield*, an Illinois Supreme Court case which affirmed the dismissal of a retaliatory discharge claim where there was "no allegation or evidence in the record that plaintiff was an at-will employee" and therefore was "unable to state a claim for common-law retaliatory discharge under the law in Illinois." *Rehfield v. Diocese of Joliet*, 2021 IL 125656 ¶ 29. But in the

11

preceding paragraph, the opinion recognized Illinois permits retaliatory discharge claims for contractual employees who were "actually discharged from their employment." *Id.* ¶ 28 (citing *Midgett v. Sackett-Chicago, Inc.*, 473 N.E.2d 1280 (1984)). The salient holding in *Rehfield* is that a contracted employee whose contract is *not renewed* cannot bring a retaliatory discharge claim; there must be an "actual discharge." *Id.* ¶ 27 ("Illinois courts evaluating retaliatory discharge claims have refused to recognize a claim for any injury short of 'actual discharge.'") Put simply, a retaliatory discharge claim requires an employee to be fired, and an employee whose contract is not renewed has not been fired; rather, they have not been re-hired. *Id.* (actual discharge "means termination of an 'at-will' employee—one whose employment has a nonspecific duration that can be terminated for any reason—not nonrenewal of a fixed-term employment contract.") (internal citations omitted).

The present case is akin to *Midgett*, not *Rehfield*. Here, Gonzalez was actually discharged from his position at EPHS before his contractual term expired. And while the terminated employees in *Midgett* were union employees under a collective bargaining agreement, the Court does not view this fact as controlling. What matters is that Gonzalez was fired. *Midgett*, 473 N.E.2d 1280, at 1283 ("in order to provide a complete remedy it is necessary that the victim of a retaliatory discharge be given an action in tort, independent of any contract remedy the employee may have …").

The Court likewise rejects the District's argument that Gonzalez has not alleged a clearly mandated public policy. In essence, Gonzalez alleges that the District fired him because he raised concerns with RGPD and the public about how

the District handled the Incident—a student bringing a gun to a high school campus. Gonzalez cites to several Illinois statutes regulating firearms at schools, as well as how schools must prepare and respond to such incidents. [Dkt. 1 at 10-11.] It is reasonable to infer from Gonzalez's allegations (which the Court must take as true) that at least one of these statutes, requiring school officials to immediately inform the police upon learning of a firearm, was not followed, and that the District did not publicly disclose this shortcoming. Given the tort's purpose of deterring employers from firing employees who report "illegal or improper conduct", *Mims*, 2022 WL 2316199, at *4, Gonzalez's retaliatory discharge claim may proceed.

### 2. IWA

Similar to his retaliatory discharge claim, Gonzalez brings a claim under the IWA alleging he was terminated because he provided the RGPD with information regarding the Incident that showed the District failed to comply with Illinois regulations. [Dkt. 1 at 11-12.] The IWA prohibits employers from retaliating "against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15. To state a claim, then, the plaintiff must allege he disclosed illicit conduct to law enforcement and was retaliated against as a result by his employer. *Bello*, 151 F. Supp. 3d 849, at 865. The illegal conduct need not be the employer's; the reporting of any illegal conduct satisfies the IWA. *Rehfield*, 2021 IL 125656 ¶ 33 ("[n]othing in the statutory language suggests that the legislature intended to limit the Whistleblower Act's protections to those situations in which an employee blows the whistle on her

employer.") But the plaintiff "must actually report the suspected violation of state or federal law to authorities." *Bello*, 151 F. Supp. 3d 849, at 865.

The District's sole argument for dismissal is that Gonzalez "does not allege that District 401 violated any State or federal law, rule, or regulation, but merely concludes that District 401 failed to adequately protect students, and District 401 covered up its mistakes." [Dkt. 11 at 8.] This is not true and it certainly does not draw reasonable inferences in Gonzalez's favor. *Choice*, 77 F.4th 636 at 638. Gonzalez alleges that he called RGPD to inform them that student had a gun at EPHS, [Dkt. 1 ¶ 31], and then he provided RGPD with a timeline of events during the Incident, which ostensibly show that District personnel did not immediately inform police of the firearm as required by Illinois statute. [*See id.* ¶¶ 41-42, 65 n.3.] Gonzalez also alleges that the District fired him in part because he provided this information to law enforcement. Nothing more is required at the pleading stage.

### 3.    Freedom of Speech

The Court next turns to Gonzalez's claim that he was retaliated against for exercising his First Amendment right to free speech when he participated in the Fox News interview. [Dkt. 1 at 12-13.] Gonzalez was a public employee while working for EPHS, which means he must allege that "(1) []he engaged in constitutionally protected speech; (2) []he suffered a deprivation likely to deter h[im] from exercising h[is] First Amendment rights; and (3) h[is] speech was a motivating factor in h[is] employer's adverse action. *Sweet v. Town of Bargersville*, 18 F.4th 273, 277-278 (7th Cir. 2021). Public employees do not have an "unfettered right" to discuss matters related to their employment under the First Amendment, and when "public

14

employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Valentino*, 575 F.3d 664, at 671; *see also Sweet*, 18 F. 4th 273, at 278 ("an employee's speech about misconduct affecting an area within her responsibility is considered pursuant to her employment even when she is not strictly required to make it.") Ultimately, for a public employee to engage in constitutionally protected speech, the employee must speak "in the capacity of a private citizen and [speak] on a matter of public concern." *Valentino*, at 671.

The District does not discuss whether Gonzalez's media interview qualifies as constitutionally protected speech. Instead, the District contends Gonzalez has not plausibly alleged his termination was in retaliation for participating in the interview. [Dkt. 11 at 9.] The Court disagrees. Gonzalez alleges that he participated in an interview where he contradicted the District, received a call from the Principal admonishing him for doing so, and was terminated weeks later. The District's argument that the complaint's allegations demonstrate "District 401 terminated his employment because he conducted an unauthorized investigation, demonstrated inappropriate conduct, and he interfered with a police investigation" cannot be squared with the Court's obligation to draw reasonable inferences in Gonzalez's favor. *Choice*, 77 F.4th 636 at 638. This result is not changed because the interview occurred after Gonzalez was placed on administrative leave; being on leave is not the same as being terminated. [Dkt. 20 at 3.] The District's motion is denied.

15

4.     **Tortious Interference with Prospective Economic Advantage**

To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014). The defendant's actions forming the basis for this claim "must be directed at third-party business prospects." *Id.* at 686; *Webb v. Frawley*, 906 F.3d 569, 577-78 n.4 (7th Cir. 2018); *Boffa Surgical Group LLC v. Managed Healthcare Assocs.*, 2015 IL App (1st) 142984 ¶ 28 ("[a] plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed toward that third party.")

Gonzalez's tortious interference claim is based on the District's decision to inform the RGPD that it had a no-trespass order against Gonzalez and that he was barred from working events on its property. [Dkt. 1 at 14-15.]  That is, the District interfered with Gonzalez's expectancy to work with the RGPD for the District. In its motion to dismiss, the District argues Gonzalez has failed to state a claim because Gonzalez continues to work with RGPD (and therefore he has not suffered damages), and the District's decision was not unjustified. [Dkt. 11 at 10-11.]

Gonzalez's allegations do not fit neatly within the confines of a tortious interference claim. Before turning to the merits, the Court notes Gonzalez's tortious interference theory is unique; neither the parties' briefing, nor the Court's research,

has revealed a case where an employee sued a customer of his *active employer* based on the customer's decision not to work with the employee. *McCoy*, 760 F.3d 674 at 686 (noting most tortious interference claims involve an employer and its former employee). This is no accident. While an at-will employee has a reasonable expectancy of continued employment under Illinois law, *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 2023 IL App (3d) 220324, ¶¶ 22-23, 28, that expectancy cannot be breached or terminated where Gonzalez remains employed as an auxiliary officer at RGPD.[5]

The only interference Gonzalez alleges is that he can no longer work at District events, but Gonzalez does not allege facts sufficient to show that he had a reasonable expectancy of doing so. Nor could he, as the District cannot interfere with itself, nor can working District events for RGPD by fairly construed as a "third-party business prospect[]." *McCoy*, 760 F.3d 674, at 685; *Webb*, 906 F.3d 569, at 577-78 n.4. The outcome here might be different if Gonzalez was fired from RGPD[6], but Gonzalez has not alleged the District interfered with any reasonable expectancy he had at RGPD.

**5. IWPCA**

Gonzalez's contract with EPHS stated that Gonzalez would be paid $37,590 for the 2022-2023 school year, which consisted of "179 days, including 8 paid holidays." [Dkt. 1-1 at 2.] The contract is silent on all aspects of termination, including the parties' obligations in the event Gonzalez was terminated mid-year. [*Id.*] Gonzalez

---

[5]     The Seventh Circuit has suggested this is sufficient in and of itself to dismiss the claim. *McCoy*, 760 F.3d 674 at 686 ("[i]t is possible that Illinois courts would require a complete termination of the prospective relationship as the district court did in this case...")

[6]     In *Grako*, a terminated employee sued a client of her former employer who allegedly "leveraged his status as a client of her former employer to secure her termination." *Grako*, 2023 IL App (3d) 220324, at ¶ 1.

alleges the District paid him $27,720 before he was terminated, but has refused to pay the balance. [Dkt. 1 at 15.]

According to Gonzalez, this violates Section 5 of the IWPCA, which states employers "shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5. "Final compensation" is defined as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other *compensation owed* the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (emphasis added). Ultimately, to state a claim under Section 5, a plaintiff need allege "he had an employment agreement with the employer that required the payment of wages or final compensation and … that the defendants were employers under the Wage Act." *Watts v. ADDO Management, L.L.C.*, 2018 IL App (1st) 170201 ¶ 14.

The resolution of the District's motion turns on whether the roughly $10,000 Gonzalez did not receive constitutes "final compensation." The Illinois Appellate Court has answered this question in the negative. In *Majmudar*, an employee executed a relatively bare-bones five-year contract with an employer. *Majmudar v. House of Spices (India), Inc.*, 2013 IL App (1st) 130292 ¶ 3. After a bench trial, the court determined the plaintiff was fired without cause during the contractual term and awarded the plaintiff damages for his breach of contract claim. *Id.* ¶ 6. The trial court rejected, however, plaintiff's argument that he was also owed payment under

18

the IWPCA because "the Act doesn't apply to prospective payments under the circumstances in which the termination is being contested by the employer for cause." *Id.* ¶ 7. After reviewing the statute's history, definitions, and structure, the Appellate Court affirmed, holding final compensation "necessarily requires the employer to have received something from the employee." [*Id.* ¶¶ 9-15.] The court elaborated:

> In this case, that something was plaintiff's employment, and his compensation in exchange for his employment was governed by the contractual agreement. Once plaintiff's employment was terminated, so was the agreement, particularly because there was a question at the time of termination as to whether plaintiff was terminated for cause. Then, it necessarily follows that at the time of termination defendant owed plaintiff no further compensation pursuant to the contract as 'final compensation,' because defendant was no longer receiving anything in exchange for that compensation and believed it had terminated plaintiff for cause. Therefore, in these circumstances, the unpaid future wages pursuant to the terminated contract is not final compensation and cannot be recovered under the Act.

[*Id.* ¶ 15.] The same logic applies here. The contract Gonzalez executed makes clear that his $37,590 salary was in exchange for him working 179 school days (minus permitted absences). [Dkt. 1-1.] Gonzalez does not allege the District failed to pay him on a *pro rata* basis for the days he worked, and nothing in the contract suggests the $37,590 was comprised of some other form of compensation beyond "unpaid future wages." This differentiates the cases Gonzalez relies on, which involved non-wage forms of compensation such as severance. *See Swift v. DeliverCareRx, Inc.*, 2015 WL 3897046, at *5-6 (N.D. Ill. June 23, 2015) (contract employee executed explicitly provided for "Termination Payments", which the employer agreed to pay in the event it terminated employee without cause); *Elsener v. Brown*, 2013 IL App (2d) 120209 (agreed-to severance payments are final compensation). Gonzalez has failed to allege

he is owed any final compensation under the IWPCA, so the District's motion to dismiss is granted.

### 6. Depravation of Property Right without Due Process

Gonzalez's penultimate count is based on the District's alleged lack of due process in reaching the decision to terminate him. [Dkt. 1 at 16-17.] To state such a claim, a plaintiff must allege "defendants (1) engaged in conduct under color of state law, (2) that deprived the plaintiff of a protected property interest, (3) without due process of law." *Bounds v. Country Club Hills Sch. Dist. 160*, 64 F.4th 926, 929 (7th Cir. 2023). An employee with a fixed contractual term has a protected property interest. *See id.*

The District's sole argument for dismissal is that Gonzalez was an at-will employee, and at-will employees do not have a property interest in their continued employment. [Dkt. 11 at 13.] In support, the District relies on *Ohlemeier*, a case where the court found an employee to be at-will—notwithstanding a letter from the school district offering certain employment terms for the upcoming school year—because the letter incorporated the district's policies, which stated employees could be terminated with two-week notice. *Ohlemeier v. Cmty. Consol. Sch. Dist. No. 90*, 151 Ill. App. 3d 710, 716 (1987).

The District argues its contract with Gonzalez also refers to its policies, so Gonzalez is therefore an at-will employee.[7] The Court disagrees. Not only does the District fail to explain what policies are inconsistent with the contract (e.g., a policy

---

[7]     The contract states "You will be afforded 10 sick days and two (2) personal days annually, and other leave provisions according to Board policy." [Dkt. 1-1 at 2.]

stating employees such as Gonzalez can be terminated at will) but, as noted repeatedly, the Court must draw reasonable inferences in Gonzalez's favor at this stage of the case. The reasonable inference to be drawn here is that Gonzalez is *not* an at-will employee because he adequately alleges that he executed a contract that gave him the right to work at EPHS for the 2022-2023 calendar year. Then, the District terminated that interest without giving Gonzalez an opportunity to be heard, and summarily refused his request to appeal that decision. The District makes no other arguments for dismissal of this claim, so the motion is denied.

### 7. Depravation of Occupational Liberty

Gonzalez's final claim alleges that the District deprived him of his liberty interest in his chosen occupation when it informed the RGPD that there was a "no trespass" order against Gonzalez, and that he was not allowed to work at District events. [Dkt. 1 at 17-18.] To pursue this claim, Gonzalez must show that "(1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001); *see also Martin v. Haling*, 94 F.4th 667, 671 (7th Cir. 2024) ("A stigma-plus deprivation involves an injury to a plaintiff's reputation plus a change in legal status") (cleaned up). With respect to the third prong—tangible loss of employment opportunities—a plaintiff must allege "his good name, reputation, honor or integrity was called into question in a manner that makes it virtually impossible for him to find new employment in his chosen field." *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010).

21

Gonzalez's allegations fall well short of this "high bar." *Martin*, 94 F.4th 667, at 672. Gonzalez merely alleges that the District told the RGPD that Gonzalez could not work events on their property and that there was a "no trespass" order against Gonazlez. [Dkt. 1 at 17-18.] He does not point to any other way in which he has been hampered in his ability to work as an auxiliary officer. The inability to work for one customer does not show it is "virtually impossible for him to find new employment in his chosen field". *Abcarian*, 617 F.3d 931, at 941; *Martin*, 94 F.4th 667, at 672 ("a plaintiff does not have a constitutional right to work for a particular customer"); *Chi. United Indus., Ltd. v. City of Chicago*, 669 F.3d 847, 850 (7th Cir. 2012) ("a liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment"). Indeed, Gonzalez does not need new employment at all; he is still working for RGPD, which dooms his claim. *Abcarian*, 617 F.3d 931, at 941 ("Abcarian cannot meet this burden for a simple and benign reason: he still has his job in his chosen profession!").

## IV.    Conclusion

For the reasons stated herein, the District's motion to dismiss is granted in part and denied in part. It is granted as to Count IV (Tortious Interference with Prospective Economic Advantage); Count V (IWPCA); and Count VII (Deprivation of Occupational Liberty). Gonzalez conceded his claims for punitive damages are unavailable so that component of this Complaint is dismissed. The motion is otherwise denied.

The Court doubts Gonzalez could amend the dismissed counts consistent with this opinion, but in an abundance of caution the Court will permit Gonzalez the opportunity to file an amended complaint if he so chooses. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015) ("a court should deny leave to amend only if it is certain that amendment would be futile or otherwise unwarranted.")

Enter: 24 CV 2014
Date:  August 15, 2014

_____

Lindsay C. Jenkins
United States District Judge

23